Thank you, BBC The last case this afternoon is 419-0061 Henry Craig H, and the appellant is Kelly Schulte. Is that pronounced correctly? Schulte. Schulte. Thank you. For that, please, Timothy Langergan and Ms. Schulte, you may proceed. Good afternoon, Justices. Counsel, may it please the Court? Counsel. My name is Kelly Schulte, and I work for Guardianship and Advocacy Commission's Legal Advocacy Services, and I'm here representing the respondent appellant, Craig H. The issue before the Court today is whether the power of attorney that was executed by Craig H. prior to going to McFarland Mental Health Center is valid, and whether it should have been honored by McFarland and the Court below. What do you mean by that? When you say it should have been honored, therefore what? Had it been honored, what would be the effect? Had it been honored, there never would have been a hearing, first of all. There would have been no need for a hearing for medication under 107.1 of the Code, and Craig H. would not have been given medication against his will unless it fell under the emergency 107 type of medication. He would have been like anyone else at McFarland who had capacity to make decisions, and if they refused the medication, they would not have given him the medication. Craig executed the POA in 2013, and he named his mom as his agent, and the short form for the POA for health care can be limited, so a person can say, I don't want you making psychiatric decisions for me, I don't want to do X, I don't want to do Y. Craig did no such thing. Craig allowed his mom all of the rights that were listed, essentially, in the power of attorney for health care, which includes psychiatric commitment and treatment. In 2016, in November, Craig was admitted to McFarland as unfit to stand trial. Soon after, in 2017, the hospital filed a petition for involuntary treatment, and at that time we litigated that through motions to dismiss and responses. Eventually, the hospital withdrew that petition. However, the next year, in 2018, a second petition was filed by another doctor, and a motion to dismiss was filed, response pleadings were filed, and a hearing was held, and that petition was denied. And that petition was denied even though, as required by the mental health code, that POA that was unlimited was signed, was attached to the petition, so the court could see, the state could see, and the court could see that he had a valid POA at the time. We went to hearing, and during the hearing, the petition was granted, and Craig H. was medicated, pursuant to an order. His theme date was about a month after the hearing, so I would assume that he was medicated for that month until he left. The POA law for health care specifically refers to mental health, and that law supersedes all other Illinois acts of laws to the extent that those laws might be inconsistent with the POA law. So to the extent that the state, both in 2017 and 2018, read the mental health code as inconsistent to that, by saying that instead of 107.1 being a way to medicate someone who has no capacity and does not have a POA or a mental health declaration, the state chose to read that as those three things were equal. And the hospital could just choose which of those they wanted to use to medicate somebody. The flip side of any decision making is the right not only to consent to medication, but to refuse. So the state basically said that the court could choose, the hospital could choose, either of those three ways to medicate somebody, to treat somebody. They neglected to say either of those three could be used to refuse treatment. The DHS rules say that DHS should honor POAs. So DHS was in violation of its own rules when it brought the case against Craig H. twice. This is a matter of public policy. A person should be able to... Why was he at the McFarland Mental Health Center? He had criminal charges, and he was found unfit to stand trial. So he was still a civil patient. He had not been convicted of anything. He was a civil patient. So he was there pursuant to a court order? Yes, he was. And what should they have done with him given the behavior he demonstrated? For his behaviors, they could have medicated him or used less restrictive interventions should his behavior become such that he was at imminent risk of serious harm to himself or someone else. So even if a person has capacity, you can use 107 to address those behaviors under those circumstances. If Dr. Everhart thinks that we can't make him better without the use of psychotropic medication, is there any way she can achieve that goal? Not if his POA says no. If one of her clients has capacity and says no, she said that in her testimony. She said that if another patient who has capacity had the same behaviors, the same diagnosis as Craig, she would not bring him to court. She would allow him to refuse. The difference here is there's a substitute decision maker who should be allowed to step into Craig's shoes. I thought there was provision under which if someone is engaged in sufficiently bizarre behavior, that they can seek to have psychotropic medication used under those circumstances. Well, again... Whether they refuse or not. Yes, that's 107. That's the emergency section, if you will, for the code. That gives hospitals the right to medicate someone if they are at imminent risk of serious harm to themselves or someone else, and no lesser restrictive means are available. So if these people who have capacity and are refusing medication start acting up in a manner that could fulfill those criteria, then the hospital can give them a shot, take them into seclusion, restrain them. If his bizarre behavior falls short of a danger to himself or others... Then they would have to... Then there's nothing else they can do if the bizarre behavior includes eating the document that they give him to sign for permission for psychotropic medicine? Yes. They could not treat him under those circumstances unless they could somehow show that him eating the paper put him at imminent risk of bodily harm to himself. Probably not someone else in that scenario, but no, they could not treat him. People are allowed to be mentally ill. They're allowed to be mentally ill in the world. They're allowed to have bizarre behaviors out in the world. They're allowed to have bizarre behaviors in a mental health treatment center. So the only way you can medicate... You were just... I interrupted you. I'm sorry. As a matter of... You're talking about policy. Why is that good policy? Because... Why should we think that that's the policy of the legislature? Because individuals have rights. And that's paramount. So this individual has a right to be found unfit and committed to McFarland forever? No, he's not. The criminal courts put a limit on how long a person can be held as unfit. So they can't stay forever. Unfortunately... How long is it? I'm not sure under the criminal code. I do know that for a misdemeanor that would maybe be up to a year in jail, if they are found unfit close to that year that they've been in county jail, for example, they have another year that they could keep them. That's my understanding. What is the... What was he found unfit? What was the charge against him in this case? I believe it was burglary or robbery, something like that. How long could he be held in McFarland on that? I don't know, Justice. Why is that good policy? Why is that something that we should take the legislature into account? Because he doesn't lose his rights. And the power of attorney law says they don't lose their rights and they don't get medicated if they choose to refuse. And if their power of attorney agent refuses, it's the same as if they refused. People on forensic units at McFarland refuse medications every day. Why is this good policy? Why is it good policy to keep him in McFarland for years when he's refusing the treatment that might make him better? It's good policy because individuals have rights. In this case, he's there because he's being subject to criminal prosecution. Correct. He's been sent there in order for a determination to be made as to whether he's going to be fit, right? That's right. So there's a little bit of an additional cog in the wheel here. This isn't just somebody that's there on voluntary or involuntary commitment and then he winds up getting held over and now they want to administer psych-appropriate medication. There's a basic purpose in his being there is to get him found fit so that he can now be prosecuted. Why doesn't that add into the equation? It's as if he's allowed to frustrate his prosecution. If he doesn't take medication and the doctors believe the medication will help him, he may not ever achieve fitness and the doctors then would have to report to the court, this guy's not going to retain fitness. What do you want to do with him? Many times they'll drop the cases and seek to have that person committed civilly. But it doesn't mean that we can throw people in there who have not been convicted. Certainly he's the same as any other civil committee at that point. Well, he hasn't been thrown in there. He's been put in there just like everybody else. True. And there's nothing different about his situation than any other commitment. My question though is, if in fact the purpose of his being there is to get him found fit so that he can then be prosecuted, why is he now permitted to frustrate that process? Because Illinois rejected the notion that we can have different criteria for just making someone fit. So in Illinois, there has to be a reason. It has to be to treat the mental illness, not to make someone fit. Which they're attempting to do. By treating the mental illness. And now you've got a doctor who says, the only way I'm going to be able to treat this gentleman's mental illness is by giving him these medications. That doesn't jive with... I'm saying that because he's got a power of attorney, his mother, who could just as easily be motivated by a desire to frustrate the criminal justice system in denying her consent, that that now trumps everything. Well, he could still be held, he could still be found to be not guilty by reason of insanity and placed in a mental institution for years instead of in the criminal system. So there are things that can be done. That's a decision to be made from an executive point of view. True. But here, all we're talking about is, what does 107.1 allow? And does the power of attorney for health care law count when you're mentally ill? Does it matter? And in Craig's case, it didn't. And in many other cases, though, as doctor testified, someone in his shoes, a forensic patient who had his own capacity, could still refuse because it's so invasive to force someone to take dangerous drugs. Very invasive. And that should be paramount to getting someone fit for trial. The person's bodily integrity is so important, and it shouldn't be something that we do just to see if someone can be okay for trial down the road. Well, it's not like it's some worthwhile experiment. No, but in some ways, the doctors will tell you they don't know how it's going to work. What's the purpose of a POA? POA is to allow an individual to place someone they trust in their shoes. To do what? To make decisions on their behalf when they can no longer do so. And those decisions, the intention of giving them that ability is to make decisions that would be in the best interest of the person, right? Not necessarily. Oh, you can get a POA for suicide. You can get a POA. Well, you can't have a POA to do something that would be illegal, but you can have a POA. For example, a POA makes the decision that they think their principal would want made. People refuse medication for all kinds of reasons. People maybe don't trust doctors. People have... This lady had seen her son for years and years go through different medications. She'd seen his friends go through different medications and saw what happens to them. So she had a very strong opinion about psychotropic medication, and she and her son did not want to be on those. And so the issue does, does POA for health care mean what it says when it says that it trumps inconsistent law to the extent that 107.1 is inconsistent, and we don't think it is? Should PREG-H be singled out and not be able to rely on a power of attorney for health care? It's interesting that the state early below said that it's a laundry list, essentially, that you could choose to have someone medicated via a 107.1 hearing, via POA, or via a mental health declaration. But Marianne P., the Supreme Court made it clear that a 107.1 finding, and this case was a jury, but by the decision-maker, those people or that person doesn't know, this principal doesn't have a background with them, isn't going to have an ongoing relationship. And so they are not the same, they're lesser than the person who has been chosen to make decisions on his behalf. And either the power of attorney for health care law means what it says, and PREG-H and other mentally ill people like him can count on it, or it doesn't. And we argue that it does. It means what it says. He has the right to make that decision, and when he's at McFarland and he's well and he has capacity, he can refuse meds, and his mother should be able to refuse them on his behalf. She has not been removed as his POA, he has not torn up the POA or rescinded it in any manner. She should have the right to make that decision for him. Thank you. Are there any other questions? I see none. Thank you, counsel. Thank you. Mr. Landrigan. Thank you, your honors. May it please the court. Good afternoon again, counsel. From the state's perspective, the issue before the court this afternoon is known as statutory construction. Section 107.1 is fairly clear as to what is required of the state to establish before the involuntary application of psychotropic medication. Clearly, the legislature was aware of the POA statute when it enacted 107.1. 107.1 specifically incorporates references to powers of attorney and people holding them. However, the statute does not state anywhere that a person holding a power of attorney has the right or that their acquiescence is required as an element which must be met prior to the forced administration of psychotropic drugs. A through G is pretty clear. Acceptance or permission from a power of attorney is not present. By statutory construction, it's the plain meaning of the act. It's not required. There's nothing to suggest the power of attorney is supreme over any other act, nor is there anything to suggest that 107.1 is inconsistent with the power of attorney act. As the court has pointed out, the state has a peniological interest in this situation in addition to just its parents' parathe. This gentleman has a felony charged against him. He's being held at McFarland because he's unfit to stand trial. The state has an interest in seeing that he becomes fit. If you allow the mother to usurp any authority or power that the state may have to bring this individual, this defendant, in compliance with the statute and allow that individual to be declared fit to stand trial, it frustrates the entire peniological purpose. Let me ask you this, so I'll make sure I understand the sequence of how things work. Let's assume there is no POA here, and he's committed to McFarland. The determination is not fit to stand trial to see if he can be rendered fit, and the doctors are buying, but psychotropic medication might help, and they don't know of anything else that would. What are they supposed to do to get him to redo that, and what can they do if he refuses? Well, under current law, I think under 107.1, if the defendant refuses psychotropic medication, he has to first be declared unfit, or the doctor, and that's one of the requirements, that the recipient lacks the capacity to make a reasoned decision about the treatment, Section 8. So that has to be established before you can advance a 107.1 petition. So by that, you mean the state could file a petition for the use of psychotropic medication pursuant to that for a hearing in front of a judge? Yes. And then the question would be, does he have capacity to refuse? I'm sorry, Judge, the issue would be whether or not the defendant has capacity to refuse. Yes, is that what you just said? I want to make sure I understand. Yes, I believe as part of the state's burden of proof, they would have to establish by testimony of the treating physician that the defendant lacked capacity pursuant to the language in Section 4E. What would that mean, that he lacks capacity to understand how this works, what they're trying to do? I mean, we're dealing with someone who's got a mental illness, I suppose this is in addition to and beyond the mental illness that's otherwise he's been diagnosed as having? Well, I'm assuming, having not been a physician, that there are mental illnesses that run the gamut. You can have a severe, you can have a mild. Some of them may be of the mild form that because you have a mental illness that does not necessarily mean that you lack the ability to make a reasoned decision about treatment. Well, let's assume he has a reasoned ability to assess the treatment of psychotropic medications and says, I don't want it, I don't. Is there anything further that the state can do? I'm not aware of it. Because if I understand correctly, that's Ms. Schultz's argument here, that the power of attorney as another is essentially in the role of making this call, and she says, no. Right, and that's the state's fear. And what's your analysis on why the no instrument plot? He could have said no if he had a reasoned ability to do something. Isn't that the case, as you just explained? Well, apparently, according to the legislature, the structure that we have now, the state is powerless to force involuntary treatment unless the recipient of that treatment is deemed to be incompetent to make that decision for himself. If he is competent and he wishes to suffer with the illness, I think he probably has that right under Illinois law. In this case, if we were to agree with you and confirm the defendant, I guess, and of course this is after the fact, but the defendant could say, well, we want to get rid of the power of attorney, he and his mother, some of this will, and then we do that through the normal situation where it's a question of whether he has the reasoned power to decline. I'm not sure if I'll... I'm sorry, Judge, I'm having a hard time hearing you. Well, I'll try to speak up. If there weren't the power of attorney in this case, then are we just focused on whether he has the reasoned ability to decline? Yes. And, of course, we're dealing with... I take it this has already happened, so we're dealing with a moot matter, which the argument is we need to provide some guidance here, but let's assume this was an initial pending proceeding, nothing had happened yet, and his mother had been consulted as the holder of the POA and says, no, I don't want him to proceed. And you say, no, we think under the statute you can, you just can't do that, and then he and his mother say, well, then forget about the POA, now we're back to where it's just me, and now I'm refusing and I have a reasoned capacity, we'd be back at that point? Yes, you would. And then that would be the same evidentiary hearing that you would normally have in the statute, where they would have the burden to establish that you lack that reasonable capacity. But the difference, I take it, with a power of attorney is the issue of is there a reason the capacity doesn't exist with regard to a refusal by the holder of the power of attorney. Is that right? That is, when Mom says no, there's no appeal from that, as there might be if it were that it responded himself. Yes, yes, I mean... If it were to respond himself, he could say, well, he has no reasoned capacity to refuse and have a hearing on that. But when Mom says no, that's the end. That's the problem. That's Ms. Jones' argument that you disagree. Yes, I don't believe that was the legislative intent. It totally eviscerates 107.1. Was there any concern or attempt to bring into question Mom's capacity? No, because I'm not sure the state has that authority. I mean, that's, again, part of the problem. Where does this domino line finally stop? And that's why I think that power of attorney was recognized by the legislature, it was understood by the legislature, and it was not required to have the POA's permission to go forth with a 107.1 petition for that very reason. It just frustrates the entire procedure that has been established here. But what about the supremacy clause that's in the power of attorney law, where it talks about the fact that it applies to all health care providers and this article supersedes all other Illinois acts or parts thereof existing on the effective date? I mean, that language seems really clear. Well, there's a case law right now that suggests that that is not all-encompassing, that there are exceptions to the power of attorney, and I recite those in the brief so that there are instances. Also in this situation, we have a peniological interest in addition to the state's paren prati interest. I just don't think that the power of attorney act was intended to operate to usurp all other statutes such as this one. I don't think that they're necessarily conflicted. Mother holding the power of attorney has received a copy of the petition. She has been made aware of the date and time of the hearing. She's invited to come forth and to give testimony as to what she feels her son would have wanted had he been competent to do so, which is the subjective standard discussed by the Supreme Court. So it's not like she's being ignored. In fact, the trial court in this instance asked that she appear and give testimony of that nature, but she refused. So it seems like the sole intent here is simply to thwart the application of 107.1, and I just don't think that's the legislative intent. They could have put that in the act had they intended that to be another hurdle the state needed to overcome. They did not. And I think it's inappropriate to read that into the act at this time. There's nothing further. I don't see anything. Thank you, counsel. Ms. Sherwood, do you need a rebuttal? Please. Okay. A person who has capacity, who's a forensic patient, is not dragged into court to answer for that. As the state is saying that Craig H's POA should be dragged into court to somehow just give some testimony and justify her decision. You call it dragged. We call it due process. Not if other people who are in the same position don't have to do that. This is the only case we've got in front of us. Right. The analogy here is, and it may be a poor choice of words, make her come before the court to explain herself. That is what the state seems to be advocating. And give an opportunity. The state was referring to her right to be notified and right to express what she believed to be the wishes of her son as her son's power of attorney. That is true. But we don't make the people who are in his same position, with his same behaviors, come to court and explain their reasoning, explain why they made the decision they did. We don't do that. The only people that they did that to is Craig H. Because they're saying... I'm confused about what you mean by that, honestly. Well, the analogy was, you know, the state has an interest in making these folks fit for trial. There are a lot of forensic patients at McFarland who have capacity to either agree to medication or refuse. And they honor that, as the doctor testified. So those people she said she would not file a petition on, even though she wants them to take medication and they're refusing. She believes they have capacity, and she does not do that. She doesn't make them come to court and explain themselves. And she didn't believe that Craig H. had capacity, but your position is the power of attorney has capacity, and that person is stepping in in his shoes. So are you really comparing apples to apples? Yes, it's decision-maker to decision-maker. And in Craig's case, the decision-maker that he put in place, put in his own shoes via the power of attorney law that assured him that it would be honored and that doctors would not have any liability for the treatment they gave or did not give because of the POA, he should not be brought into court. His mom should not be brought into court. Well, isn't the real distinction that you're making, I think, most pointed out by Justice Steigman's question, that if it were the individual, they could just go ahead and go through 107.1, go through that process, and get the order. But the POA somehow trumps that now, so that as long as there's an existing POA who says no, the process that would normally be applicable to any person in this situation is no longer applicable. There is a recourse. They could have gone to probate court. They could have tried to get the POA, I don't know, dismantled. They could go to court and say that this person is not making decisions in my patient's best interest. They could try to get her removed. That's what you need to do, not just allege. We don't like what the mom's saying. We don't like the decision she's saying. Therefore, we're going to ignore everything. They did not do what they needed to do. If they really truly thought that she was not able to make that decision and not capable, then they should have done that. They should have gone and gotten her removed. They did not do that. Let's assume she's fully capable of making the decision. What you're saying is, as long as you've got a POA, then this emergency procedure can never be utilized against you. We would argue that the treatment petition, 107.1, cannot be used. But 107, the emergency procedure, could be. I'm sorry, I'm both. Yes. The 107.1. Frankly, if a doctor believes a patient has capacity, he or she should not bring a petition against that person. They don't routinely bring them into court when they know they have capacity. And Dr. Eberhardt's very ethical. She would not do that. And she said on the record she would not bring someone into court with his same illness, same behaviors, if the person had capacity. She doesn't do that. But she doesn't think Craig Gage has capacity. No, but she never proved that his mom did not. That's not my question. She doesn't think Craig Gage has capacity. That's true. She did a petition. In the POA, there would be a, I guess there's a petition under the statute for a use of psychotropic medicine. Involuntary administration of psychotropic medicine. Involuntary, when someone has no capacity to refuse. Correct. In the POA, in your position, the legislature intended to cut this? Go ahead, Nancy. Thank you. Yes, I believe the legislature did. 107.1 is only to be used when a person does not have capacity, does not have a POA, and does not have a mental health declaration. Unless the POA itself, the instrument or the mental health declaration, somehow usurps power or takes power from the decision maker, the agent in this case under the POA. So if Craig had said, I don't want my mom making any decisions on psychiatric treatment, then in those circumstances, Craig could have been brought into court, rightly, for a 107.1. Thank you, counsel. Thank you, judges. We'll take this matter under review. Stand at ease.